No. 26-2478

# In the United States Court of Appeals for the Eighth Circuit

**NETCHOICE,**

*Plaintiff-Appellee,*

*v.*

**MICHAEL HILGERS,**

*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Nebraska
The Honorable John M. Gerrard

## BRIEF FOR DEFENDANT-APPELLANT

MICHAEL T. HILGERS
Attorney General of Nebraska

Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297

CODY S. BARNETT
Solicitor General
cody.barnett@nebraska.gov

LINCOLN J. KORELL
Deputy Solicitor General

Counsel for Defendant-Appellant

## Summary of the Case

Nebraska's Parental Rights in Social Media Act requires social media companies to verify a user's age and, if the user is a minor, to obtain parental consent before allowing the user to create a social media account. *See* Neb. Rev. Stat. § 86-1703(1)(a), (2). The Act also requires social media companies to provide methods by which parents can supervise their children's social media activity. *Id.* § 86-1703(4).

NetChoice sued the Nebraska Attorney General, claiming the Parental Rights Act violates the First Amendment, and moved to preliminarily enjoin it. The district court granted the preliminary injunction in part and denied it in part. Relevant to this appeal, the district court concluded that NetChoice was likely to prevail in its claim that the Act's age-verification and parental-consent provisions facially violate the First Amendment. To get there, the district court skewed several First Amendment doctrines.

The Attorney General now brings this interlocutory appeal, and NetChoice has also filed a cross-appeal. Given the complexity and gravity of these appeals, the Attorney General requests 40 minutes of oral argument—20 minutes each side.



Appellate Case: 26-2478 Page: 2 Date Filed: 10/15/2026 Entry ID: 5694743

## TABLE OF CONTENTS

Page

Summary of the Case .......... i

Table of Authorities .......... iii

Introduction .......... 1

Statement of Jurisdiction .......... 2

Statement of Issues .......... 2

Statement of the Case .......... 3

I. Background .......... 3

II. Procedural History .......... 5

Summary of the Argument .......... 6

Standard of Review .......... 7

Argument .......... 8

I. NetChoice Does Not Have Standing to Assert the Rights of Its Members' Users .......... 8

II. The Act Is Constitutional. .......... 12

A. The First Amendment does not protect speech to children absent parental consent. .......... 12

B. The Act regulates commercial contracts, not speech. .......... 21

C. The Act is content-neutral. .......... 27

D. The Act survives any level of scrutiny. .......... 32

III. The Other Preliminary-Injunction Factors Weigh in the State's Favor. .......... 38

Conclusion .......... 39



Appellate Case: 26-2478 Page: 3 Date Filed: 10/15/2026 Entry ID: 5694743

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ark. Times LP v. Waldrip*,
37 F.4th 1386 (8th Cir. 2022) (en banc) .......... 24

*Bellotti v. Baird*,
443 U.S. 622 (1979) .......... 22, 23

*Bigelow v. Virginia*,
421 U.S. 809 (1975) .......... 2, 9

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .......... *passim*

*Carson v. Simon*,
978 F.3d 1051 (8th Cir. 2020) .......... 39

*Chi., Burlington & Quincy R.R. Co. v. McGuire*,
219 U.S. 549 (1911) .......... 22

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
640 F.2d 109 (8th Cir. 1981) (en banc) .......... 3, 38

*Eddings v. Oklahoma*,
455 U.S. 104 (1982) .......... 22

*Erznoznik v. Jacksonville*,
422 U.S. 205 (1975) .......... 20

*Free Speech Coalition, Inc. v. Paxton*,
606 U.S. 461 (2025) .......... 16, 17, 32, 38

*Frisbie v. United States*,
157 U.S. 160 (1895) .......... 22

*Ginsberg v. New York*,
390 U.S. 629 (1968) .......... *passim*

**Cases—continued**

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ........ 9, 10

*Interactive Digital Software Ass'n v. St. Louis County*,
329 F.3d 954 (8th Cir. 2003) ........ 19, 21

*Iowa Safe Schs. v. Reynolds*,
172 F.4th 589 (8th Cir. 2026) ........ 7

*J.D.B. v. North Carolina*,
564 U.S. 261 (2011) ........ 22, 23

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) ........ 2, 8

*Laird v. Tatum*,
408 U.S. 1 (1972) ........ 9

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ........ 15

*Meyer v. Nebraska*,
262 U.S. 390 (1923) ........ 14

*Mirabelli v. Bonta*,
607 U.S. 492 (2026) (per curiam) ........ 15

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........ 11, 12, 25, 27

*NetChoice, L.L.C. v. Fitch*,
134 F.4th 799 (5th Cir. 2025) ........ 27

*NetChoice, LLC v. Yost*,
180 F.4th 268 (6th Cir. 2026) ........ *passim*

*Ogden v. Saunders*,
25 U.S. (12 Wheat.) 213 (1827) ........ 22



Appellate Case: 26-2478 Page: 5 Date Filed: 10/15/2026 Entry ID: 5694743

**Cases—continued**

*Ostergren v. Cuccinelli*,
615 F.3d 263 (4th Cir. 2010) .......... 33

*Parham v. J.R.*,
442 U.S. 584 (1979) .......... 14, 15

*People v. Kahan*,
206 N.E.2d 333 (N.Y. 1965) .......... 16, 17

*Pierce v. Soc'y of the Sisters*,
268 U.S. 510 (1925) .......... 15

*Prince v. Massachusetts*,
321 U.S. 158 (1944) .......... 18

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 28, 32

*Sable Commc'ns of Cal., Inc. v. FCC*,
492 U.S. 115 (1989) .......... 33

*Sabri v. United States*,
541 U.S. 600 (2004) .......... 9, 10, 11

*Smith v. Daily Mail Publ'g Co.*,
443 U.S. 97 (1979) .......... 33

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .......... 2, 9, 10

*Swanson v. Hilgers*,
151 F.4th 992 (8th Cir. 2025) .......... 8

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) .......... *passim*

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 11



Appellate Case: 26-2478 Page: 6 Date Filed: 10/15/2026 Entry ID: 5694743

**Cases—continued**

*Trump v. Hawaii*,
585 U.S. 667 (2018) ... 11

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ... 27, 29, 31

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997) ... 32, 38

*United States v. Hansen*,
599 U.S. 762 (2023) ... 9

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ... 26, 29

*Warth v. Seldin*,
422 U.S. 490 (1975) ... 8

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) ... 37

**Statutes**

28 U.S.C.
§ 1292 ... 2
§ 1331 ... 2

Mass. Gen. Laws ch. 272, § 1 ... 14

Neb. Rev. Stat.
§ 86-1701 ... 4
§ 86-1702 ... 4, 28, 30
§ 86-1703 ... i, 4, 17, 22
§ 86-1704 ... 4, 5
§ 86-1705 ... 4, 5

## Historical Authorities

1789 Va. Acts ch. 8, § 3, *in* 13 Va. Stat. at Large 7, 8 (Hening ed. 1823) .......... 14

2 James Kent, Commentaries on American Law 276 (William M. Lacy ed., Phila., Blackstone Publ'g Co. 1889) (1826–30) .......... 13

2 Quarterly Courts of Essex County, Massachusetts 180 (George Francis Dow ed., 1912) .......... 14

12 Records of the Colony of New Plymouth in New England 29 (David Pulsifer ed., Boston, William White 1861) .......... 14

An Act Concerning Inns and Taverns, § 1 (Apr. 17, 1846), *in* N.J. Rev. Stat. tit. XXI, ch. 12, at 590 (1847) .......... 14

Conn. Code of 1650, 70 ¶ 1 (Hartford, Silas Andrus 1822) .......... 14

Lydia Child, The Mother's Book 92 (1831) .......... 13

Records of the Colony or Jurisdiction of New Haven From May 1653, to the Union 600 (Charles J. Hoadly ed., Hartford, Case, Lockwood & Co. 1858) .......... 14

## Other Authorities

Amanda Raffoul et al., *Social Media Platforms Generate Billions of Dollars in Revenue from U.S. Youth: Findings from a Simulated Revenue Model*, PlosOne (Dec. 27, 2023) .......... 31

Appellee's Brief, *Interactive Digit. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954 (8th Cir. 2003) (No. 02-3010), 2002 WL 34247067 .......... 21

Fed. R. App. P. 4(a)(1)(A) .......... 2

**Other Authorities—continued**

*Mainstreaming Extremism: Social Media's Role in Radicalizing America: Hearing Before the Subcomm. on Consumer Prot. & Com. of the H. Comm. on Energy & Com.*, 116th Cong. 30 (2020) (testimony of Tim Kendall, CEO, Moment) ........ 32

*The Truth About Career Progression*, YouTube (Mar. 6, 2023) ........ 30

Zara Abrams, *Instagram's Effects on Mental Health*, Monitor on Psychology 32 (Mar. 2022) ........ 34



Appellate Case: 26-2478 Page: 9 Date Filed: 10/15/2026 Entry ID: 5694743

## Introduction

Our Nation has long recognized that parents not only have a duty but a sacred right to protect their children. That right includes standing at the front door and denying entrance to anyone who would do children harm.

That right does not change simply because the "front door" is digital rather than physical. No matter how strangers seek to gain entrance into children's lives, the parental gatekeeping right can stop them. But social media companies have been circumventing parents by crawling through digital back windows, where children simply lie about their age to access harmful, addictive features, forfeiting data privacy and legal rights in the process. NetChoice argues that the First Amendment prevents Nebraska from requiring social media companies to obtain parental consent at the digital front door before entering a child's room. And NetChoice does so by appealing to the First Amendment rights of the very children social media is harming.

But it is parents—not NetChoice—who have the right to speak on behalf of these children. Nebraska seeks to put authority back where it belongs—in the hands of parents. And the First Amendment has never been understood to prevent states from doing so.

## Statement of Jurisdiction

For the reasons highlighted below, NetChoice lacks standing, thus depriving the district court of jurisdiction to enter an injunction.

Otherwise, NetChoice claims the Parental Rights Act violates the First Amendment of the United States Constitution. App. 21–33; R. Doc. 1, at 21–33. Thus, the district court had federal-question jurisdiction under 28 U.S.C. § 1331. The district court entered an order on June 27, 2026, preliminarily enjoining part of the Act. App. 876–902; R. Doc. 33. The Attorney General timely noticed his interlocutory appeal on July 23, 2026. App. 908; R. Doc. 39; *see* Fed. R. App. P. 4(a)(1)(A).

This Court has appellate jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1) because it is an appeal from the district court's interlocutory order granting an injunction.

## Statement of Issues

The issues presented are:

1. Whether the district court erred in concluding NetChoice has standing to assert the First Amendment claims of its members' users.

    *Kowalski v. Tesmer*, 543 U.S. 125 (2004)

    *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023)

    *Bigelow v. Virginia*, 421 U.S. 809 (1975)

    *NetChoice, LLC v. Yost*, 180 F.4th 268 (6th Cir. 2026)

2. Whether the district court erred in concluding NetChoice is likely to succeed on the merits of its claim that the age-verification and parental-consent provisions of the Parental Rights Act violate the First Amendment.

*Ginsberg v. New York*, 390 U.S. 629 (1968)

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011)

*TikTok Inc. v. Garland*, 604 U.S. 56 (2025)

3. Whether the district court erred in concluding that the remaining preliminary-injunction factors weighed in favor of enjoining the age-verification and parental-consent provisions of the Parental Rights Act.

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc)

## Statement of the Case

### I. Background

A. The age of social media has taken a toll on Nebraska's children. Today, adolescent social media use is nearly universal—up to 95% of teenagers, and nearly 40% of children ages 8–12, report using it. App. 854; R. Doc. 24-22, at 4. And as our children's screen time has increased, so has their unhappiness, inability to sleep, attention problems, eating disorders, depression, anxiety, neuroticism, and suicidal ideation. App. 745–54, 860; R. Doc. 24-21 ¶¶ 26–37; R. Doc. 24-22, at 10. Compulsive social media use has even been shown to be linked



Appellate Case: 26-2478 Page: 12 Date Filed: 10/15/2026 Entry ID: 5694743

to changes in brain structure similar to those seen in persons with substance abuse or gambling addictions. App. 859; R. Doc. 24-22, at 9.

B. Against this backdrop, Nebraska passed the Parental Rights in Social Media Act. *See* Neb. Rev. Stat. §§ 86-1701 to -1705. The Parental Rights Act requires social media companies to obtain parental consent before allowing a minor to "become an account holder." *Id.* § 86-1703(2). An "account holder" means a person who "creates an account or profile on a social media platform." *Id.* § 86-1702(1). An account holder is distinct from a "[u]ser," who is "a person who consumes posts on a social media platform but who *is not an account holder*." *Id.* § 86-1702(12) (emphasis added). A parent can consent by signing a form and returning it to the social media company or a third-party vendor by mail, fax, or electronic scan. *Id.* § 86-1703(2)(b). The Act also requires social media companies to provide parents with methods for supervising their children's social media activity, including viewing posts, controlling settings, and limiting a child's time spent on the platform. *Id.* § 86-1703(4).

To keep minors from becoming account holders without parental consent by simply lying about their age, the Act requires social media companies to verify a person's age before he can become an account holder. *Id.* § 86-1703(1)(a). Age verification can be performed through any "commercially reasonable age verification method." *Id.* §§ 86-1702(9), 86-1703(1)(a), (2)(a).



Appellate Case: 26-2478 Page: 13 Date Filed: 10/15/2026 Entry ID: 5694743

The Attorney General is responsible for enforcing the Parental Rights Act and can impose a penalty of up to $2,500 per violation. *Id.* § 86-1705. The Act also creates a civil right of action for parents and minors harmed by a violation. *Id.* § 86-1704.

## II. Procedural History

NetChoice is a trade association whose members are online companies, including Facebook, Instagram, X, YouTube, TikTok, Snapchat, Reddit, Dreamwidth, and Nextdoor. App. 6–7; R. Doc. 1 ¶ 13. NetChoice sued the Attorney General, seeking a declaration that the Act is unconstitutional under the First Amendment. App. 35; R. Doc. 1, at 35. NetChoice also sought to preliminarily and permanently enjoin the Attorney General from enforcing the Act. *Id.*

The district court granted NetChoice's motion for preliminary injunction in part and denied it in part. The court concluded that the Act's provisions requiring social media companies to provide parents with methods of supervising their children's online activity "are likely to survive constitutional scrutiny." App. 902; R. Doc. 33, at 27. But the court also concluded that the Act's parental-*consent* and age-verification provisions likely violate the First Amendment. App. 901–02; R. Doc. 33, at 26–27. The court thus preliminarily enjoined the Attorney General from enforcing those provisions. *Id.* The Attorney General appeals.

## SUMMARY OF THE ARGUMENT

The district court erred in partially granting NetChoice's motion for preliminary injunction. NetChoice is not likely to succeed on the merits of its claims for multiple reasons. First, NetChoice does not have standing to assert its claims in the first place. NetChoice is neither regulated nor injured by the Act. But the district court concluded NetChoice has standing by stacking two standing exceptions on top of one another. It found NetChoice had *representational standing* to bring its members' claims. Then it found that under the *overbreadth doctrine*, NetChoice's members could bring the claims of their minor users. But these standing exceptions are to be applied narrowly, and the district court erred by combining them to expand standing into new territory.

Standing aside, the Act's age-verification and parental-consent provisions are constitutional for at least four reasons. *First*, the First Amendment does not protect speech with minors to which their parents do not consent. Neither does it give adults a right to avoid age verification to ensure minors with non-consenting parents cannot simply lie to circumvent their parents' wishes.

*Second*, the Act regulates commercial conduct, not speech. The Act does not restrict a minor's access to social media *content*; it restricts a minor's ability to create an account by which the child forfeits important legal rights and allows the social media company to harvest account data

to enable addictive features. Account creation is a commercial transaction—not speech.

*Third*, the Act is content neutral and thus subject, at most, to intermediate scrutiny. It restricts minors from creating accounts *regardless* of the content or message they intend to consume. Indeed, if a platform does not allow users to create an account, the Act does not apply, regardless of what speech is hosted on the platform. Inversely, social media companies that enable account creation cannot avoid the Act's requirements simply by changing the content of their platform's speech.

*Finally*, the Act is constitutional under any level of scrutiny because Nebraska has a compelling governmental interest in protecting its children from psychological harm and from signing away important legal rights. And the Act is narrowly tailored and the least restrictive means for advancing this interest. The Act does not ban children's access to social media; it merely puts the issue of whether children should create an account in the hands of parents—where it should have been all along.

## Standard of Review

This Court reviews the district court's decision to grant a preliminary injunction *de novo* as to the district court's legal conclusions, for clear error as to its factual findings, and for abuse of discretion as to its application of the law to the facts. *Iowa Safe Schs. v. Reynolds*, 172 F.4th 589, 594 (8th Cir. 2026).



Appellate Case: 26-2478 Page: 16 Date Filed: 10/15/2026 Entry ID: 5694743

## ARGUMENT

### I. NetChoice Does Not Have Standing to Assert the Rights of Its Members' Users.

The district court erred in concluding that NetChoice has standing to assert the free-speech rights of its *members' users*. NetChoice is a trade association. App. 6–7; R. Doc. 1 ¶ 13. It does not operate a social media platform. Nor is it directly regulated by the Act. Neither does the Act restrict NetChoice's members from creating, curating, or distributing content. Instead, the district court's standing analysis relied heavily on the First Amendment rights of social media *users* who cannot create a social media account without age verification and parental consent. *See* App. 884–85; R. Doc. 33, at 9–10.

Parties are ordinarily limited to asserting their "own legal rights and interests." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). For good reason. Preventing parties from raising others' rights keeps courts from deciding "'abstract questions of wide public significance' which should remain with 'governmental institutions ... more competent to address' them." *Swanson v. Hilgers*, 151 F.4th 992, 996 (8th Cir. 2025) (quoting *Kowalski*, 543 U.S. at 129). Thus, parties ordinarily "cannot rest [their] claim[s] to relief on the legal rights or interests of third parties." *Id.* (quoting *Warth*, 422 U.S. at 499). But the district court concluded NetChoice likely had standing by combining two standing exceptions.



Appellate Case: 26-2478 Page: 17 Date Filed: 10/15/2026 Entry ID: 5694743

First, "representational standing" (also known as "associational standing") allows an organization to bring a suit on behalf of its members, provided that (a) its members would have standing "to sue in their own right," (b) "the interests it seeks to protect are germane to the organization's purpose," and (c) the claims and relief sought do not "require[] the participation of individual members." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Second, the district court relied on the First Amendment's overbreadth doctrine, which permits a party to challenge a statute as facially unconstitutional even if the statute can be lawfully applied to the plaintiff. *United States v. Hansen*, 599 U.S. 762, 769 (2023). However, under the overbreadth doctrine, the party challenging the statute must still have a "claim of specific present objective harm or a threat of specific future harm." *Bigelow v. Virginia*, 421 U.S. 809, 816–17 (1975) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). The Supreme Court is reticent of overbreadth claims and has allowed them "in relatively few settings." *Sabri v. United States*, 541 U.S. 600, 609–10 (2004).

The district court concluded NetChoice had standing by stacking these exceptions together. It found NetChoice had representational standing to bring an overbreadth claim by finding its members would have standing to bring an overbreadth claim. But the district court did

not cite anything to suggest that it could stack these two exceptions together. To the contrary—the two do not mix here.

*First*, NetChoice's members would not have standing to bring an overbreadth claim that relies on the First Amendment rights of minors. Third-party standing—including for overbreadth claims—"is almost certainly impermissible in any case where the plaintiff's and the third parties' interests are at odds." *NetChoice, LLC v. Yost*, 180 F.4th 268, 309 (6th Cir. 2026) (Batchelder, J., concurring in the judgment). And—as a majority of the Sixth Circuit panel concluded in NetChoice's challenge to Ohio's similar social media law—NetChoice does not have standing to assert the claims of minors against a law intended to *protect* minors. *Id.*; *id.* at 283–85 (opinion of Clay, J.). NetChoice's interests are simply not aligned with the rights of the minors whose claims it seeks to assert.

*Second*, representational standing applies only where an organization's members have standing "to sue in *their own right*." *Students for Fair Admissions*, 600 U.S. at 199 (quoting *Hunt*, 432 U.S. at 343) (emphasis added). But the whole point of the overbreadth doctrine is that it allows plaintiffs to assert *other people's* rights. Indeed, the overbreadth doctrine "allow[s] a determination that the law would be unconstitutionally applied to *different parties* and *different circumstances* from those at hand." *Sabri*, 541 U.S. at 609 (emphasis added). Thus, NetChoice does not have representational standing to bring an overbreadth challenge because its representational standing is

limited to claims related to its members' "own right[s]," not the rights of third parties.[1]

NetChoice attempts to craft a new type of standing where it asserts the rights of members *to assert the rights of non-members*. This is effectively *fourth-party* standing. But outside of the "limited settings" in which the Supreme Court has blessed overbreadth claims—which do not include fourth-party standing claims—this Court cannot "extend an invitation to bring overbreadth claims" without "good reason."[2] *Sabri*, 541 U.S. at 610. No good reason exists here. Thus, this Court should "decline to recognize third-party standing for NetChoice to rest its overbreadth challenge on allegations that the Act violates Children Users' First Amendment rights." *Yost*, 180 F.4th at 285 (opinion of Clay, J.); *accord id.* at 309 (Batchelder, J., concurring in the judgment).

[1] And given representational standing's "lack of historical pedigree and the Supreme Court's recent skepticism toward 'prudential' standing doctrines intertwined" with it, this Court should be reluctant to apply it in a new context. *Yost*, 180 F.4th at 304 (Batchelder, J., concurring in the judgment).

[2] The overbreadth doctrine has also been criticized because allowing a plaintiff to seek redress for applications of a statute "that have nothing to do with his injury" is "inconsistent with longstanding limits on equitable relief and the power of Article III courts." *Moody v. NetChoice, LLC*, 603 U.S. 707, 756 (2024) (Thomas, J., concurring in the judgment) (quoting *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring)); *see generally Trump v. CASA, Inc.*, 606 U.S. 831, 841–47 (2025) (holding that universal injunctions fall outside of the federal judiciary's traditional equitable authority).



Appellate Case: 26-2478 Page: 20 Date Filed: 10/15/2026 Entry ID: 5694743

## II. The Act Is Constitutional.

The district court concluded NetChoice was likely to succeed on the merits of its facial challenge to the Parental Rights Act. Specifically, the district court concluded that the Act is facially overbroad. That was error.

A party bringing a First Amendment facial challenge has a burden to show "the law's unconstitutional applications *substantially outweigh* its constitutional ones." *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024) (emphasis added). This is a "rigorous standard," and NetChoice falls short. *Id.* at 723.

The Act's age-verification and parental-consent provisions are facially constitutional because *all* their applications are constitutional, for at least four reasons. *First*, the First Amendment does not protect speech to minors without parental consent. *Second*, the Act regulates commercial conduct—not speech—because it regulates only a minor's ability to contract without parental consent. *Third*, the Act is content-neutral because its application is agnostic to the type of speech hosted by the platform. And *finally*, the Act survives all levels of scrutiny.

### A. The First Amendment does not protect speech to children absent parental consent.

The district court concluded the Act is overbroad because it violates the First Amendment rights of children to access social media. *See* App. 886; R. Doc. 33, at 11. While the Act does not regulate speech in the first place, *see* pp. 21–26, *infra*, if there is any speech restricted, it is speech to

minors with non-consenting parents. The Constitution simply does not guarantee NetChoice's members or their users an audience of children regardless of parental consent.

1. The First Amendment's historical context is revealing—from the founding era to modern day, it has never been understood to protect speech with minors behind the backs of non-consenting parents.

"The historical evidence shows that the founding generation believed parents had absolute authority over their minor children[.]" *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 822 (2011) (Thomas, J., dissenting). The authority of parents also extended into controlling what their children read. The popular cultural sentiment through early American history was that "[p]arents had total authority over what their children read." *Id.* at 832. Society believed that "[c]hildren ... should not read anything without a mother's knowledge and sanction." *Id.* (quoting Lydia Child, The Mother's Book 92 (1831)).

And parental authority was not just respected in culture—it was enshrined in law. The calculus was simple: Parents "are bound to maintain and educate their children"; thus, "the law has given them a right to such authority." 2 James Kent, Commentaries on American Law 276 (William M. Lacy ed., Phila., Blackstone Publ'g Co. 1889) (1826–30).

Thus, colonial and founding-era laws prohibited certain forms of speech to children without the consent of their parents. For example, the Massachusetts Colony held tavern keepers criminally liable for



Appellate Case: 26-2478 Page: 22 Date Filed: 10/15/2026 Entry ID: 5694743

"entertaining men's sons … at an unseasonable time in the night." 2 Quarterly Courts of Essex County, Massachusetts 180 (George Francis Dow ed., 1912). New Haven Colony laws imposed liability on anyone who attempted "to inveagle[] or draw the affections of" a man's daughter, including "by speech, writing, message," without the consent of her father. Records of the Colony or Jurisdiction of New Haven From May 1653, to the Union 600 (Charles J. Hoadly ed., Hartford, Case, Lockwood & Co. 1858); *accord* 12 Records of the Colony of New Plymouth in New England 29 (David Pulsifer ed., Boston, William White 1861); Conn. Code of 1650, 70, ¶ 1 (Hartford, Silas Andrus 1822).

After independence, Virginia banned proposing to a maid "by secret letters, messages or otherwise" without her father's consent. 1789 Va. Acts ch. 8, § 3, *in* 13 Va. Stat. at Large 7, 8 (Hening ed. 1823); *see also, e.g.*, Mass. Gen. Laws ch. 272, § 1. In 1846, New Jersey made it "unlawful for any tavern-keeper in this state, to receive and entertain at his or her house of public entertainment, any minor [student] under the age of twenty-one years." An Act Concerning Inns and Taverns, § 1 (Apr. 17, 1846), *in* N.J. Rev. Stat. tit. XXI, ch. 12, at 590 (1847).

The Supreme Court's jurisprudence also "reflect[s] Western civilization concepts of the family as a unit with broad parental authority over minor children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). The twentieth century saw a wave of Supreme Court cases vindicating parental authority over children. In *Meyer v. Nebraska*, 262 U.S. 390, 400

(1923), the Court held that the Constitution protected the parents' rights to educate children in their native tongue. Two years later, the Court struck down Oregon's compulsory public education laws as "unreasonably interfer[ing] with the liberty of parents and guardians to direct the upbringing and education of children." *Pierce v. Soc'y of the Sisters*, 268 U.S. 510, 534–35 (1925); *see also Mirabelli v. Bonta*, 607 U.S. 492 (2026) (per curiam); *Mahmoud v. Taylor*, 606 U.S. 522 (2025).

While *Pierce*, *Meyer*, and their progeny defend the rights of parents *against* governmental intrusion, the Court has also affirmed the right of government to pass laws *supporting* parental rights. In *Parham*, the Court upheld a Georgia statute that allowed parents to initiate voluntary commitment proceedings for their children. 442 U.S. at 604. While the committed minors argued that their constitutional rights must trump parental authority, the Court reasoned that "[p]arents can and must make [many] judgments" which children simply lack "sound judgment[]" to make. *Id.* at 603.

As it relates to speech, in *Ginsberg v. New York*, 390 U.S. 629 (1968), the Court upheld a New York statute that prohibited selling minors "material defined to be obscene on the basis of its appeal to them whether or not it would be obscene to adults." *Id.* at 631. The Court explained that "constitutional interpretation has consistently recognized" that parents' authority "in their own household to direct the rearing of their children is basic in the structure of our society." *Id.* at

639. Thus, the State can bolster parental authority through "laws designed to aid discharge of that responsibility." *Id.* The Court also emphasized that while "the supervision of children's reading may best be left to their parents," the State has a role to play in "regulat[ing] the sale of material" to children because "parental control or guidance cannot always be provided." *Id.* at 640 (quoting *People v. Kahan*, 206 N.E.2d 333, 334 (N.Y. 1965) (Fuld, J., concurring)).

More recently, the Court recognized that the First Amendment does not guarantee unfettered access to children. In *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 482–83 (2025), the Supreme Court upheld a Texas law requiring pornographic websites to verify that their users are not children. The Court recognized that even adults "have no First Amendment right to avoid age verification, and [Texas's] statute can readily be understood as an effort to restrict minors' access." *Id.* Even in *Brown*, 564 U.S. at 805—a case the district court heavily relied on—the Court explained that "helping concerned parents control their children" is a legitimate end of legislation.

The First Amendment simply does not guarantee—nor has it ever guaranteed—access to children without parental consent.

2. The Parental Rights Act fits comfortably in the category of "laws designed to aid [parents'] discharge" of their "responsibility for [their] children's well-being." *Ginsberg*, 390 U.S. at 639. It does so by requiring social media companies to (1) obtain parental consent before

allowing children to create an account and (2) give parents the ability to supervise their children's social media activity. Neb. Rev. Stat. § 86-1703(2), (4). It is a digital equivalent to historic laws that prohibited certain people from engaging with children without parental consent. *See* pp. 13–14, *supra*.

As the Supreme Court reasoned in *Ginsberg*, "the supervision of children's reading may best be left to their parents." 390 U.S. at 640 (quoting *Kahan*, 206 N.E.2d at 334 (Fuld, J., concurring)). And the Nebraska Legislature has "properly conclude[d]" that parents "are entitled to the support of laws" in the online marketplace, where "parental control or guidance cannot always be provided." *Id.* at 639, 640 (last quoting *Kahan*, 206 N.E.2d at 334 (Fuld, J., concurring)). And, as in *Free Speech Coalition*, the age-verification requirement is a constitutional measure to prevent children from circumventing the law by simply lying about their age. 606 U.S. at 482–83. Simply put, neither social media companies—nor their child users—have a free speech right to circumvent laws requiring parental consent.

3. The district court did not even cite *Ginsberg* (it was cited only in a nested quotation). Apparently, the court subscribed to NetChoice's interpretation that *Ginsberg* is simply a case about obscenity—which is unprotected speech. But reducing *Ginsberg* to a case only about obscenity ignores large portions of its analysis.

The Court in *Ginsberg* ultimately held that "two interests" justified New York's prohibition on "the availability of sex material to minors under 17." 390 U.S. at 639. The *first* was that "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Id.* The Court thus found it "proper[]" for the New York Legislature to bolster that authority. *Id.* The second interest was that "[t]he State … has an independent interest in the well-being of its youth." *Id.* at 640. Notably, neither interest is limited to sexual material.

Given those two interests, the Court concluded that "[t]he only question remaining … is whether the New York Legislature might rationally conclude" that the prohibited material is an "abuse[] which might prevent [children's] growth into free and independent well-developed men and citizens." *Id.* at 640–41 (quotation marks omitted) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944)). The Court held that the restrictions cleared that hurdle. *Id.*

To be sure, the Court heavily relied on the maxim that "obscenity is not protected expression." *Id.* at 641. But *Ginsberg* was not about whether New York could prohibit the sale of obscenity to minors—that much was already well established. *See id.* at 635. The question in *Ginsberg* was whether New York could prohibit the sale of sexual material to minors that was "not obscene for adults." *Id.* at 634.



Appellate Case: 26-2478 Page: 27 Date Filed: 10/15/2026 Entry ID: 5694743

The Court never held that the material defendants sold was obscene. Instead, the Court held that New York could determine for *itself* that the material was obscene based on its harm to children and defend parental rights by banning its sale to children. *Id.* at 639. In other words, New York's ability to redefine obscenity was part and parcel of more fundamental governmental interests—supporting parental authority and protecting children from harmful material. The Parental Rights Act serves both purposes—it supports parental authority by ensuring parents have the final say in deciding whether their children are exposed to platforms that have proven harmful to children. *See* pp. 34–36, *infra*.

4. While ignoring *Ginsberg*, the district court relied heavily on the Supreme Court's decision in *Brown* and this Court's decision in *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954 (8th Cir. 2003). Both are inapposite.

In *Brown*, the Supreme Court held that California's ban on the sale or rental of "violent video games" violated the First Amendment. 564 U.S. at 805. California's law was not about parental consent or protecting parental rights. Indeed, California's law prohibited the sale of violent video games even to children whose parents *consented*. *Id.* at 804. The Court explained that banning the sale of a class of protected speech to children "*just in case* their parents disapprove of that speech" is not "a proper governmental means of aiding parental authority." *Id.* at 802. The Court also noted that the video game industry was already restricting

children from purchasing mature-rated products. *Id.* at 803. The Court thus concluded that the law did not support what parents "actually want," but only "what the State thinks parents *ought* to want." *Id.* at 804 (emphasis in original).

The Act here is quite the opposite. It does not ban social media access. It does not even ban social media access without parental consent. *See* pp. 22–23, *infra*. It simply requires that before allowing a child to create an account—which subjects children to contractual terms and triggers some of social media's most harmful features, *see* pp. 23, 35–36 *infra*—a social media company must obtain parental consent. And while California's law attempted "to protect the young from ideas or images that a *legislative body* thinks unsuitable for them," *Brown*, 564 U.S. at 795 (emphasis added) (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 213–14 (1975)), the Act puts the decision back in the hands of *parents* to determine what is suitable for their children. Thus, like Ohio's substantially similar law upheld in the Sixth Circuit, the Act "does not necessarily make assumptions about parents' values"; it simply "seeks to involve parents because their involvement itself will inherently mitigate some of the harms of unsupervised social media use." *Yost*, 180 F.4th at 290 (opinion of Clay, J.). *Brown* is inapposite.

Neither does *Interactive Digital Software* support the district court's conclusion. While St. Louis County's violent-video-game ban made room for parental consent, the County argued only that (1) video games



Appellate Case: 26-2478 Page: 29 Date Filed: 10/15/2026 Entry ID: 5694743

are not speech, (2) violent video games are obscene for children, and (3) the county ordinance survives strict scrutiny. Appellee's Brief at 17–18, 22, 23, *Interactive Digit. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954 (8th Cir. 2003) (No. 02-3010), 2002 WL 34247067. This Court rejected each argument in turn and did not consider whether speech to minors without consent of their parents is protected by the First Amendment in the first place. *See Interactive Digit.*, 329 F.3d at 956–60. Thus, *Interactive Digital* has nothing to say about whether social media companies have a First Amendment right to avoid parental consent.

*   *   *   *   *

At bottom, from the colonial era to the current day, American jurisprudence has consistently recognized parents' rights to control what their children read and with whom their children interact. And the Supreme Court was clear in *Ginsberg*—the First Amendment does not forbid states from passing laws to assist parents in carrying out their responsibilities, especially in places where children and third parties can so easily circumvent parental control. Nebraska has put the social-media decision back in the hands of parents. NetChoice's members do not have a constitutional right to evade the watchful parental eye.

### B. The Act regulates commercial contracts, not speech.

The Parental Rights Act conforms to the First Amendment for a second reason—it regulates only *contracts* with minors, not speech.



Appellate Case: 26-2478 Page: 30 Date Filed: 10/15/2026 Entry ID: 5694743

1. The right to contract with a minor is not protected by the First Amendment. A corporation does not have the right to enter into a "contract which the laws of the community forbid." *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 283 (1827). And "[i]t is within the undoubted power of government to restrain some individuals from all contracts," including denying "the minor the right to assume any obligations." *Chi., Burlington & Quincy R.R. Co. v. McGuire*, 219 U.S. 549, 567 (1911) (quoting *Frisbie v. United States*, 157 U.S. 160, 165 (1895)). This is because children "generally are less mature and responsible than adults" and "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them." *J.D.B. v. North Carolina*, 564 U.S. 261, 273 (2011) (first quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115–16 (1982), then quoting *Bellotti v. Baird*, 443 U.S. 622, 635 (1979) (plurality opinion)). Thus, the law places "limitations on their ability to … enter a binding contract enforceable against them." *Id.*

The Parental Rights Act simply restricts social media companies from "enter[ing] a binding contract enforceable against [minors]" without parental consent. *Id.* Nothing under the Act limits a minor from simply *accessing* social media. The Act instead provides that "a social media company shall not permit a minor to become an account holder" without parental consent. Neb. Rev. Stat. § 86-1703(1)(a), (2). Thus, for social media companies like YouTube, TikTok, and Nextdoor, who do not require a "user" to become an "account holder" to access their platforms,



Appellate Case: 26-2478 Page: 31 Date Filed: 10/15/2026 Entry ID: 5694743

*see* App. 142, 158, 220, 229; R. Doc. 24-1 ¶ 24; R. Doc. 24-5, at 1; R. Doc. 24-10, at 2; R. Doc. 24-11, at 5, a minor can still access content without age verification or parental consent. The Act's restrictions are triggered only when that minor seeks to become an "account holder."

Creating social media accounts requires users to agree to terms and conditions which minors "lack the experience, perspective, and judgment" to wisely evaluate. *J.D.B.*, 564 U.S. at 273 (quoting *Bellotti*, 443 U.S. at 635). NetChoice's members require a user to agree to their terms of service before becoming an account holder. *See* App. 139–40; R. Doc. 24-1 ¶¶ 4–14. And these terms are not benign—many require a user to give up important legal rights. For example, account holders may (1) grant the company the right to collect, transfer, and use their data, App. 215; R. Doc. 24-9, at 7; (2) waive liability for any amount exceeding "the greater of $100 or the amount [the user] ha[s] paid," App. 238; R. Doc. 24-11, at 14; (3) waive the right to participate in class actions, App. 214; R. Doc. 24-9, at 6; (4) consent to personal jurisdiction in a specific state, App. 214; R. Doc. 24-9, at 6; and (5) grant a "non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of [the user's] content," App. 155; R. Doc. 24-4, at 3.

Regardless of whether NetChoice's members are selling speech or sandwiches, it is no mystery why the State would restrict their ability to obtain and use personal data of minors, or limit how minors can seek



Appellate Case: 26-2478 Page: 32 Date Filed: 10/15/2026 Entry ID: 5694743

legal redress for harms, without parental consent. NetChoice's members do not have a First Amendment right to trap unwitting minors into forfeiting important legal rights.

2. The district court rejected this reasoning, concluding that "expressive, communicative conduct … triggers the law's restrictions, thereby implicating the First Amendment." App. 887; R. Doc. 33, at 12. That merely assumes the problem. Nebraska's law targets account creation. And account creation is neither speech nor expressive conduct. Minors are not restricted from accessing speech—they are restricted from creating *accounts*, which require certain terms and conditions. *See* p. 23, *supra*. Social media companies can avoid the Act's restrictions altogether by allowing users to access all their content without creating an account. But NetChoice's members are subject to the Act's restrictions only because they have made the commercial decision to require users to agree to terms and conditions before accessing the platform.

To draw an analog, Nebraska is not prohibiting minors from entering the movie theater; Nebraska is simply restricting a minor's ability to sign away their own legal rights without parental consent as a condition of entering the theater. In other words, the Act is constitutional because it "targets [only] the noncommunicative aspect of the contractors' conduct—unexpressive commercial choices." *Ark. Times LP v. Waldrip*, 37 F.4th 1386, 1394 (8th Cir. 2022) (en banc); *see also TikTok Inc. v. Garland*, 604 U.S. 56, 72 (2025) (holding that a law prohibiting

companies from distributing the social media platform TikTok was justified by its aim of "preventing China from collecting vast amounts of sensitive data").

This stands in contrast to *Moody*, where Florida and Texas were regulating expressive conduct itself. In *Moody*, the Court held that social media platforms' curation of speech is itself expressive speech. *Moody*, 603 U.S. at 731. Thus, the Court cast doubt on the constitutionality of Texas and Florida laws that "restrict[ed] the ability of social-media platforms to control whether and how third-party posts are presented to other users." *Id.* at 717, 743–44. But here the Act does not restrict how social media platforms curate third-party content; it merely restricts social media companies' ability to make the unexpressive choice to contract with minors without parental consent.

The district court also reasoned that the Act was more akin to the California law prohibiting the sale of video games in *Brown* than to the law restricting TikTok's Chinese ownership in *TikTok*. App. 887; R. Doc. 33, at 12. Quite the opposite is true.

As detailed, California's law in *Brown* was an outright ban on selling a protected category of speech to minors based on California's preference against such speech. 564 U.S. at 789. And to the extent California restricted a contract—i.e., the sale—it was incidental to its aim of restricting speech it found unsuitable. *Id.* at 795.



Appellate Case: 26-2478 Page: 34 Date Filed: 10/15/2026 Entry ID: 5694743

The Parental Rights Act does no such thing. It seeks to restrict the *contract* itself—not speech. This is evidenced by the fact that the Act permits users to access *all* of NetChoice's members' content—its restrictions are triggered only when minors create an account. *Brown* would be more analogous if the California law required parental consent before the minor could forfeit important legal rights as a condition of playing a video game. But *Brown* was simply California's enforcing its disapproval of particular content—regardless of the parents' consent.

*TikTok* is much more analogous. There, like here, the target was not a particular form of speech, but the unexpressive business decisions of a social media company. In *TikTok*, the Court emphasized that the law restricting access to TikTok "reflects a 'purpose unrelated to the content of expression.'" 604 U.S. at 72 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). That purpose was keeping China from capturing and using personal data of Americans; here, the purpose is keeping social media companies from imposing detrimental contractual terms on minors, including capturing and using their personal data. This case is more like *TikTok* than *Brown*.

3. Even if this Court decides the Act regulates commercial conduct *and* speech, the district court erred by giving *no* weight under its *Moody* analysis to the Act's legitimate application to conduct. A facial challenge to a law under the First Amendment succeeds only "if the law's unconstitutional applications substantially outweigh its constitutional

ones." *Moody*, 603 U.S. at 724. But rather than "decid[ing] which of the laws' applications violate the First Amendment," *id.* at 725, the district court made the sweeping declaration that "[o]n the whole, the law is not tailored to solve the identified problem." App. 898; R. Doc. 33, at 23.

But the district court failed to acknowledge the Act's constitutional sweep as applied to conduct. For example, the court criticized the Act for not "focus[ing] on harmful contract terms or addictive features," App. 899; R. Doc. 33, at 24, but then failed to credit the Act's constitutionality *as applied to harmful contract terms and addictive features*. But because it did not even recognize the Act's plainly legitimate application to conduct, it did not properly "weigh violative applications of the Act against non-violative applications." *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 809 (5th Cir. 2025). That alone is enough to reverse. *See id.*

### C. The Act is content-neutral.

Though the Act does not regulate speech, it would be subject to only intermediate scrutiny if it did because it is content-neutral.

1. Content-neutral laws "are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *TikTok*, 604 U.S. at 70 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994)). A law is content-based if it (1) "applies to particular speech because of the topic discussed or the idea or message expressed," or (2) "'cannot be justified without reference to the content of the regulated

speech' or was 'adopted by the government because of disagreement with the message the speech conveys.'" *Id.* at 70–71 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015)). Neither is true of the Act.

First, the Act does not apply based on "the topic discussed or the idea or message expressed." It applies to a "social media platform," which is defined as "a website or Internet application that (i) [a]llows a person to create an account; and (ii) [e]nables an account holder to communicate with other account holders and users through posts." Neb. Rev. Stat. § 86-1702(11)(a)(i)–(ii). So a company is subject to the Act not based on any "topic," "idea," or "message," but based on structural features of its platform. Two different companies could host two different websites on the *exact* same subject matter—but one that allows a person to create an account would be covered, while one that does not allow a person to create an account would not. The content of the platform is entirely irrelevant to whether the Act applies. This is further evidenced by the fact that NetChoice's members host platforms that are *not* content specific. YouTube, Facebook, and Instagram host content related to any topic, idea, or message under the sun. Yet the Act applies to them only because they allow users to create an account.

Second, the Act can be justified without reference to the content of the speech or the disagreement with any message it conveys. The Act is justified by at least two objectives unrelated to the content of social media websites or the messages conveyed thereon. One justification, already

discussed, is to protect minors from signing away important legal rights without their knowledge. As the Supreme Court has already acknowledged, protecting users from "data collection" is a justification "'unrelated to the content of expression,' [and] is content neutral." *TikTok*, 604 U.S. at 72 (quoting *Ward*, 491 U.S. at 791).

The Act also protects minors from harmful and addictive *features* of social media platforms—regardless of the actual content posted on those platforms. Social media platforms include addictive features such as "[p]ush notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'likes'), and algorithms that leverage user data" to "maximize engagement." App. 859; R. Doc. 24-22, at 9. Extreme engagement and phone addiction have in turn led to devastating mental health effects on minors. *See* pp. 34–36, *infra*. The Act seeks to reduce the harm caused by these features by giving parents more authority over whether and how their children subject themselves to these features. Thus, the Act is concerned with the *structural* features designed to addict children to their phones, regardless of the actual content or messages the children see. At bottom, social media companies "cannot avoid or mitigate" their obligations under the Act simply "by altering their speech." *TikTok*, 604 U.S. at 73 (first quoting *Turner*, 512 U.S. at 644).

2. The district court concluded that the Act's exceptions are "fatal" to its content-neutrality. App. 889–90; R. Doc. 33, at 14–15. Particularly, the court reasoned that the exception for platforms that

"'primarily provide[] career development opportunities' .... demonstrates a facial governmental preference for career-related content over other types of protected material." App. 890; R. Doc. 33, at 15 (quoting Neb. Rev. Stat. § 86-1702(11)(b)(v)). Not so.

The career-development exception is not concerned with the *content* of the platform; it is concerned with the *function* of the platform. The Act offers no exception for platforms that have career-development *content*. YouTube, Facebook, Instagram, and X all include career-development content. *See, e.g.*, *The Truth About Career Progression*, YouTube (Mar. 6, 2023), https://perma.cc/AVA7-SZE4. The exception is for platforms that "primarily provide[] career development opportunities"—that is, platforms whose *primary function* is to connect users with resources for advancing in their careers. Neb. Rev. Stat. § 86-1702(11)(b)(v).

The district court erroneously concluded that the career-development exception reflected a legislative preference for career-related speech. But, given that many (if not all) of NetChoice's members host career-related speech on their platforms, the more likely explanation is that the Legislature judged that platforms whose primary function is *not* mere engagement—but career development—are less likely than companies whose primary function is maximizing engagement to develop features that will addict children to their phones and create negative mental health effects.



Appellate Case: 26-2478 Page: 39 Date Filed: 10/15/2026 Entry ID: 5694743

For the same reasons, even if the Act's exceptions require some evaluation of the content of speech, intermediate scrutiny is still appropriate because the exceptions are "justified" by the "special characteristic[s]" of the regulated social media platforms. *TikTok*, 604 U.S. at 73 (quoting *Turner*, 512 U.S. at 660–61). "Social media operators design their sites to hold users' attention for as long as possible." *Yost*, 180 F.4th at 277 (opinion of Clay, J.). And, as opposed to platforms whose primary function is to provide career-development opportunities, platforms whose primary function is to maximize engagement unsurprisingly achieve exactly that—maximum engagement. Indeed, "[s]ocial media platforms are highly incentivized to keep youth online—children and adolescents' online experiences are heavily monetized through advertising revenue."[3] *Yost*, 180 F.4th at 301 (Batchelder, J., concurring in the judgment). As summarized by a former social media executive, social media companies have sought "to mine as much human attention as possible and turn[] it into historically unprecedented

[3] The Sixth Circuit noted that a 2023 study estimated that the major social media companies collectively earned $11 billion in revenue from advertising directed to American children under 17 years old, including $2 billion from advertising directed to children under 12. *Yost*, 180 F.4th at 277 (opinion of Clay, J.) (citing Amanda Raffoul et al., *Social Media Platforms Generate Billions of Dollars in Revenue from U.S. Youth: Findings from a Simulated Revenue Model*, PlosOne (Dec. 27, 2023)).



Appellate Case: 26-2478 Page: 40 Date Filed: 10/15/2026 Entry ID: 5694743

profits." *Mainstreaming Extremism: Social Media's Role in Radicalizing America: Hearing Before the Subcomm. on Consumer Prot. & Com. of the H. Comm. on Energy & Com.*, 116th Cong. 30 (2020) (testimony of Tim Kendall, CEO, Moment).

And it is the special characteristic of *excessive* engagement, and social media's incentives to mine it, that the Act is targeting. Thus, the Act's exceptions are not targeted at the content of speech itself but at the fact that career-development platforms pose a lesser threat to the mental health of minors than do platforms that seek only to maximize engagement.

### D. The Act survives any level of scrutiny.

The Act clears intermediate scrutiny because it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *TikTok*, 604 U.S. at 70 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997) (*Turner II*)). But the Act would clear even strict scrutiny because it is "narrowly tailored to serve compelling state interests," *Reed*, 576 U.S. at 163, and is the least restrictive means to achieve the interest. *Free Speech Coal.*, 606 U.S. at 471.

1. The district court did not deny that Nebraska has a compelling governmental interest in protecting its minors from the harms caused by social media. The court remarked that "[e]mpirical data



Appellate Case: 26-2478 Page: 41 Date Filed: 10/15/2026 Entry ID: 5694743

supports the Attorney General's contention that increased social media use has caused a 'mental health crisis' in Nebraska," including "increased 'depressive symptoms, depression, self-harm, suicidal thoughts, suicide, and eating disorders' among adolescents since 2014." App. 893–94; R. Doc. 33, at 18–19 (quoting App. 755–56, 766; R. Doc. 24-21, at 16–17, 27). The court did not dispute that protecting minors from these harms is a compelling government interest. *See Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("[T]here is a compelling interest in protecting the physical and psychological well-being of minors.").

But the court overlooked another compelling interest: protecting minors' legal rights and informational privacy. *Cf. TikTok*, 604 U.S. at 83 (Gorsuch, J., concurring in the judgment) (concluding that "preventing a foreign country … from harvesting vast troves of personal information about tens of millions of Americans" serves a compelling government interest); *Ostergren v. Cuccinelli*, 615 F.3d 263, 280 (4th Cir. 2010) (suggesting that limiting disclosure of social security numbers to protect informational privacy may "constitute 'a state interest of the highest order'") (quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979)).

And the Act is narrowly tailored to serve each of those interests. Starting with the latter interest, it is hard to imagine how the State could more narrowly protect children from forfeiting their own informational and legal rights other than requiring parental consent before they do. Any measure besides parental consent (or a broader outright ban on such



Appellate Case: 26-2478 Page: 42 Date Filed: 10/15/2026 Entry ID: 5694743

contracts) still leaves children agreeing to terms and conditions they do not have the capacity to appreciate.

Regarding the State's interest in protecting the psychological health of its youth, the record is replete with evidence that unchecked social media access has been devastating for America's youth. The U.S. Surgeon General found in 2023 that up to 95% of thirteen- to seventeen-year-olds in the United States use social media. App. 854; R. Doc. 24-22, at 4. And despite the fact that many social media platforms have a minimum age of thirteen, "nearly 40% of children ages 8–12 use social media." *Id.* Since 2012, youth unhappiness, depression, and suicidal ideation have noticeably increased, including in Nebraska specifically. App. 746–53; R. Doc. 24-21 ¶¶ 27–36. And "some experiments have signaled that social media is a driver of psychological harm to minors." *Yost*, 180 F.4th at 276 (opinion of Clay, J.) (citing Zara Abrams, *Instagram's Effects on Mental Health*, Monitor on Psychology 32 (Mar. 2022)).

Increased social media use is linked to depression, body image issues, eating disorders, and low self-esteem. App. 858; R. Doc. 24-22, at 8. Compulsive and repeated social media use may even change a child's brain structure, much like the changes seen in persons with substance or gambling addictions. App. 859; R. Doc. 24-22, at 9. This leads to negative downstream effects such as poor sleep, which is "linked to altered



Appellate Case: 26-2478 Page: 43 Date Filed: 10/15/2026 Entry ID: 5694743

neurological development in adolescent brains, depressive symptoms, and suicidal thoughts and behaviors." App. 860; R. Doc. 24-22, at 10.

Nebraska cannot afford to wait on social media platforms to solve the problem of excessive and unchecked social media usage when those companies financially benefit from maximized engagement. Indeed, public documents from New Mexico's recent lawsuit against Meta (one of NetChoice's members) show that the company was aware that Instagram was negatively impacting teenagers' mental health yet publicly denied the research and continued to prioritize teenagers in its marketing strategy. App. 526, 622, 685–86; R. Doc. 24-17, at 10; R. Doc. 24-19, at 18, 81–82.

So Nebraska stepped in to help its teenagers. Nebraska's response was narrow and measured. The Act is not a ban. It is not even a ban on minors viewing social media without parental consent. It is simply a requirement that social media companies obtain parental consent before allowing a minor to create an account—the point at which many of social media's addictive features are triggered. For example, Instagram allows an account holder to follow other accounts and uses that data to "try and show you the [posts] that you find the most relevant." App. 642; R. Doc. 24-19, at 38. This gives the account holder a "personalized feed[] designed to maximize time spent" on the platform. App. 744; R. Doc. 24-21 ¶ 20. And a Dutch research study showed that "poor mental health increased

… among adolescent Instagram users after the introduction of the personalized feed." App. 758; R. Doc. 24-21 ¶ 45.

This evidence suggests that Nebraska may have been justified in an outright ban on children creating social media accounts. But Nebraska chose a more narrowly tailored method, still allowing children to create a social media account with parental consent. For good reason. Nobody is better situated—not NetChoice, the Legislature, or this Court—to determine whether a child is well suited to create a social media account than the child's parents.

The Act is also narrowly tailored because it "does not restrict what ideas [o]perators may circulate to Children." *Yost*, 180 F.4th at 289 (opinion of Clay, J.). Instead, like Ohio's substantially similar law that passed strict scrutiny in the Sixth Circuit, "the Act mitigates the 'objective effects' of social media use." *Id.* In other words, the Act is narrowly tailored and the least restrictive means of serving the State's compelling interest because it is triggered by *structural* features of social media and leaves content creators undisturbed in speaking their minds.

The law is not overinclusive because parents with children for whom social media is a net benefit can permit their child to create an account, while parents whose children would be negatively impacted by social media's addictive features can deny consent. Thus, Nebraska's solution is as narrow as it could be—each set of parents can make the decision for their own children.

2. The district court found that the Act was not narrowly tailored because the law targets social media accounts and not just the harmful features. The district court was also "not persuaded, at this early stage[,] … that every platform captured by [the Act] … is causing the harm identified." App. 894; R. Doc. 33, at 19.

But narrow tailoring does not require "perfect tailoring," especially where the complexity of a problem renders perfect tailoring "impossibl[e]." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015). Such is the case here.

With rapidly evolving technologies, it is impossible for a state legislature to be constantly and perfectly apprised of evolving features and the problems they create. Nor is a problem as complex as the psychological harm that social media has on minors so easily reduced to one or two features.

What is clear, however, is that children are being harmed by excessive social media use. *See* pp. 34–36, *supra*. Thus, the Nebraska Legislature responded with a narrowly tailored solution. Rather than an outright ban, the Legislature required only parental consent, and rather than requiring parental consent to even access a website, Nebraska requires parental consent only before creating an account. "That requirement constitutes a marginal burden that precisely targets the multi-faceted problem that [Nebraska] has identified: Children's unsupervised assent to terms and conditions for use of platforms that

take advantage of and harm them." *Yost*, 180 F.4th at 292 (opinion of Clay, J.).

The Act is narrowly tailored to advance Nebraska's compelling interests in protecting minors from harmful contractual terms and addictive social media features. And there is no less restrictive means than putting the decision back in the hands of the authority with whom it should have been all along—parents.[4]

## III. The Other Preliminary-Injunction Factors Weigh in the State's Favor.

The district court concluded that because "NetChoice is likely to succeed on the merits of its First Amendment claim, the other [preliminary injunction] factors weigh in its favor." App. 900–01; R. Doc. 33, at 25–26; *see Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). But given that NetChoice is *not* likely to succeed on the merits, the balance flips. NetChoice cannot claim irreparable harm to its members' users' constitutional rights when those rights are not harmed in the first place. And Nebraska has a strong interest—as does

[4] For the same reasons the Act survives the "more demanding strict-scrutiny standard," *Free Speech Coal.*, 606 U.S. at 483, it also clears intermediate scrutiny. Given that the Act is narrowly tailored to serve Nebraska's compelling interest in protecting children from psychological harm and from forfeiting their legal rights, it also necessarily "advances" those same "important" interests without "burden[ing] substantially more speech than necessary to further those interests." *Id.* (quoting *Turner II*, 520 U.S. at 189).

the public—in its ability to enforce duly enacted laws. *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020). The district court thus should have denied the preliminary injunction.

## CONCLUSION

The Court should reverse the district court's grant of a preliminary injunction and remand with instructions to deny NetChoice's motion.

Dated: October 14, 2026

Respectfully submitted.

/s/ Cody S. Barnett

CODY S. BARNETT
Solicitor General
cody.barnett@nebraska.gov

LINCOLN J. KORELL
Deputy Solicitor General

Counsel for Defendant-Appellant

MICHAEL T. HILGERS
Attorney General of Nebraska

Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297



Appellate Case: 26-2478 Page: 48 Date Filed: 10/15/2026 Entry ID: 5694743

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,135 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

/s/ Cody S. Barnett
CODY S. BARNETT

## Certificate of Service

On October 14, 2026, this brief and the accompanying addendum were served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that the documents have been scanned for viruses and are free of viruses.

/s/ Cody S. Barnett
CODY S. BARNETT



Appellate Case: 26-2478 Page: 50 Date Filed: 10/15/2026 Entry ID: 5694743